But as you all appreciate, only the stay portion of the case. We had a, Judge Higginson and I were the third judge, had an emergency stay motion a few months back involving some Texas litigation. And we knew at the time who the merits panel was, but we wouldn't say. This time we don't know. We have no idea who this might go to. The briefing, obviously, is still underway. Pam, is there a list up here? Oh, I see. Never mind. I would like, Judge Higginson and I have talked about it, Judge Dennis is our third judge and he is presiding over our conference when this is over with. He will not be able to be present today, but he will be participating fully electronically. So you really do need to stay behind the microphone. I don't recall anyone's particular habits, whether you wander around and gesture widely, but stay behind the microphone, which is that long bar, almost looks like a three-hole punch maybe, right below the light, and speak clearly, distinctly into the microphone. I would like the two advocates who are going to argue today, both to come up right now, be behind the microphone. We have some questions that the panel wants to pose before you get going. You won't be counted against your time, but please come up, both of you, to the microphone. First thing I want to raise, you are legal adversaries, but I hope personal acquaintances and friends. So I will move back and forth, whoever is speaking, to being behind the microphone. As of now, February 9, I think is the date of the briefing schedule you were initially sent, 40 days for the first brief and the rest that follows. That makes the final brief due on May 7, and the earliest this could be set for an oral argument is the June sitting. It would be advantageous, we think, to accelerate the briefing schedule, to compress it by about 10 days on each brief, where the final brief would be due in the middle of April, 30 days for the first brief, some reduction on each such that mid-April is the final brief. State of Texas have any reaction to that as the first briefer? Your Honor, obviously this is a very complex case with a lengthy record, but we have asked for expedited briefing in the alternative, and if the Court sees fit to do it, we will move heaven and earth to get a brief filed if that is necessary. Well, let me make sure I understand that. The first brief would be due March 12, is the proposal, and then 20 days after that, 10 days after that for your reply, for your rebuttal. Is that doable? We would be amenable to that if that's what the Court sees fit, Your Honor. And how about your side? No objection, Your Honor. We would definitely do that. Well, the clerk's office will issue a new briefing schedule. Don't go away. Secondly, I'm not asking for argument right now. You have your 20 minutes, but certainly the State has indicated that they have taken substantial steps towards satisfying the sorts of concerns the district judge had and plaintiffs had, probably without having real knowledge myself, with the help of the district court's impending orders, impending at the time, and so it seems to me from looking at the briefs and the arguments that a fair amount of work has been done, it is difficult for us, and it would be for the merits panel, to know how much has actually occurred, how consistent it is with what the Is there any way that the parties can get together and try to narrow this for us? Now, I do understand it's a much different point of view about what the State has accomplished from the two different sides. So I hope this is not a futile exercise. We have a mediator for the circuit to deal with all sorts of situations, Vic Chanhuck, who could help sort of narrow this more for the merits panel than for us, because we will rule before all that could be done. Is there, let me talk from the plaintiff's side first, because you're the ones who might have the argument that nothing really worthwhile has been done. I hope you're not quite taking that position, but I'll hear. Is there any utility to the exercise of trying to get the two sides to really determine how all the mandates of the district judge, the injunctions, what actually has been satisfied in some way by what the State has done and what has not, what's still in play as matters for us to resolve? Absolutely, Your Honor. I will tell you. Could you get a little bit behind? Even though there's a microphone right there, that's not the operative one. It's the one in the middle. Absolutely, Your Honor. I will tell the Court, though, the district court originally appointed two special masters. In the last four months, she changed one of them from a special master to a mediator, and so that we have had, without getting into the details of it, we have had a mediation last fall. And I don't want to raise the Court's expectations. Last fall, meaning four months ago or five months ago? But we're certainly prepared to participate in something like that. We would like to learn more. I'm sure the district judge would as well. Whether we can get everything resolved, we've tried. I don't know if we will, but it's certainly worth trying. Your Honor, the State is willing to meet. We've done so in the mediation. We're happy to do so again. I would say, to your point about not getting into the details of the argument, one of the main issues in the case, I'm sure you're aware, is the caseloads issue. And we've pointed out that in the last several years, caseloads have fallen below what plaintiff's own expert called a best practice, and this was not enough for the district court. And so we feel that no matter what we do, no matter what the legislature is going to come up with, it's not going to satisfy the district court. So is that a statement about futility? To some extent, I think that's right, Your Honor. Well, let's try it anyway, if the panel agrees. This is a proposal. Once we're on the phone with Judge Dennis to talk through this among ourselves, we'll see. But I want to see what the initial response . . . I did cut you off, but was there something further that you wanted to add? I merely wanted to say, of course, we are willing and happy to meet at any time. It's just that we're trying to get a lot of things done here in terms of moving the briefing schedule forward, getting accelerated briefs done. And so with that, I'll leave it at that. It's easy for the three of us to order something, harder for you to do it, I understand. Finally, and this may be more for the argument, but if you can give us an early sort of status point, plaintiff's first. Right now, there's a stay of it all. When we look, and there'll be questions about this, when we look at what we should do now going up until the merits panel gets the case, and then that'll be up to them on what to do thereafter, what is . . . are you able to limit the orders from her, the injunctions from Judge Jack, to say which ones seem most critical to you, that really do need to go into effect, the immediate ones, the three-months ones? Six months are really not our concern, and that would be for a later panel. Is it possible, and mediation might be part of that, to sort of nail that and come up with a list that may be challenged as to whether that's already been accomplished by the State. But can you say here, or is it a fairly lengthy response, which ones in your mind, if we were going to leave a stay in place, we should not have the stay affect these? Yes, Your Honor, we certainly can. There are four key areas that we're, on behalf of the children, we're most concerned about. One is caseloads. It really affects the entire management of the foster care system. Caseworkers are critical to the children. That, as the State has just told the Court, the State's statistics say their caseloads are going down. We seem to have the same objective, which is to get them down to a manageable number. We have a very different view of how they're doing it. Second, the placement array is something that's very important. That is, in particular, one of the placements, foster group homes, the District Judge has found are unsafe. They're dangerous placements, and children should not be in those. Foster group homes is, we submit, it is an imminent issue for the children. Children in those placements are at risk. And then, monitoring and licensing, including investigations, and one of the key things that we have found, and this case has uncovered, is the State's investigations are incredibly inaccurate. Maybe three-quarters of them are wrong, and without getting into more detail, those areas are the key areas for us. One area that, for example, Your Honor, could wait, and I think the Court's order contemplates that it would wait, is the new unified computer system. The Court's initial order on that is a plan. So that system doesn't have to be in place in three months, but what the Court has said is initially we want, the Court has directed the State to come up with a plan. We think the plan would be a good investment of time, but actually implementing the computer system, that's down the road. Okay. Your Honor, starting with the plan that counsel just mentioned, that is probably number one on our list. I guess I'm asking you, which ones do you think cannot, should not be stayed? Is that what you're responding? She was responding which ones, I'm going to got it backwards, which ones should be stayed from your viewpoint? Correct, Judge Southwick. The computer. That's the State of Texas. The computer system from the State's perspective. Even though the actual system is not being required to be operative until a year after the date, just the, having to do all the planning, all the work, I mean, I don't know whether it would be even feasible at all if we spent all the money in the world to get that thing up and running a year from now. And so that's probably number one on the list to stay. And to make clear that we're not going to, you know, it's one of those things that it can't be the case that we are allowed to, we're stayed from having to start working on it and then we find out shortly beforehand that all of a sudden it's due because it will be impossible. If we have to devote the resources, both human capital and fiscal capital, to be working on that, that's resources that have to come out from somewhere else. So that's number one. The other things, just a couple to mention, would be the foster group homes. From our perspective, those are a very valuable placement source and if we have to remove children, yank them out of those existing placements, that's going to be a harm to those children. Well, I'm not trying to use this as an additional argument and you are being limited, I understand that. But so that, you see that as a problem. How about the other things that he mentioned? Just, yes, foster group homes, that's a problem and caseload caps both for investigators and for conservatorship caseworkers, that's a problem for us. We would like that stayed. All right then. Well, one of you can stay at the podium and the other, have your seat. Thank you very much for your willingness to give us a heads up on all that. May it please the Court. By choosing to bring this lawsuit as a substantive due process class action, plaintiffs placed upon themselves the extraordinarily heavy burden of showing deliberate indifference to a substantial risk of serious harm to all 12,000 class members. They came nowhere close to meeting that heavy burden. Plaintiffs' expert testimony was woefully unreliable, the district court struck their class-wideness expert, who was the primary data source for their other experts, and the demonstrably atypical experience of the 12 hand-picked named plaintiffs were no substitute for the random representative sample of case histories that plaintiffs promised but ultimately failed to analyze. As the First Circuit recognized in Connor B., showing that a select handful of children had bad experiences in foster care is not enough to show class-wide constitutional violations. This argument you're making as to a failure of proof below after the trial, you accept that our review would be for clear error, or do you have a case that stands differently? We think the Connor B. case, Your Honor, does stand for the opposite proposition because it's procedurally almost a mirror image of this case, and there, again, we're not disputing necessarily the underlying historical facts, in other words, what happened to the named plaintiffs themselves. What we're challenging are the district court's extrapolations from those determinations about the named plaintiffs. And we think that is not the kind of historical fact-finding that is reviewed for clear error as — and that's what the Connor B. Court essentially said, because they said the party's dispute here is a legal dispute. But in any event, we would say the district court's findings or extrapolations to the class are nonetheless clearly erroneous, if that is the standard. One of your arguments — am I cutting you off? No, go ahead. One of your arguments in the brief as to this issue is that the usual way to have this sort of typical cross-section is to have a randomly selected sample. I forget what you called that, but maybe in the literature and case law, there's a certain way this sample is usually done, and that wasn't done in this case, is your argument. Isn't that still, though, a factual determination by the district court? Even if there's a traditional way, would you do — I'm going to ask you that. Is there a certain way that you believe the case law supports this random sample should have been created, and there's clear evidence in the record that wasn't done to create — to identify these 12 kids? Your Honor, to be clear, we are not saying that was absolutely the only way they possibly could have proved their case. That is what they told the district court. That's how that they were going to prove their case. We provided them the representative sample they requested. They started the analysis, and they claim that they stopped it because it was just too much of a burden to do it. And whether that's true or whether the analysis simply didn't support their findings, we don't know. But one thing we know they can't do is hand-pick a small group of plaintiffs, and then — But how do we know how these were chosen? How do we know they were hand-picked? The plaintiffs don't dispute that, Your Honor. Those were not randomly chosen children. They were picked specifically because their stories are so tragic. My difficulty — I mean, just looking at our law, put aside Conner B, it seemed to me, especially in Ruiz, which is the single case the parties sort of all coincide with on stay authority, we were pretty clear that it was proper — that's the word that we used — to infer from a small number to a lot of prisoners. And the issue of statistical studies came up, and the court said those are inconclusive. But yet there was no error that we found in the district court's inferences. And again, we're not saying it's improper to infer from a small group harm to a larger group. And indeed, they could have done it in this case with a representative sample. But if you hand-pick or cherry-pick a small group that's not representative — Right. But there were 10 experts, and there were 28 witnesses. And the witnesses included people — I'm sure you know the record more than I do — Carpenter. Ms. Carpenter? Yes. She said 50 percent of the Texas kids she saw had been sexually abused, 50 percent. And that was 180 or 150 that she'd seen. And then Ms. Richter said, quote, almost all of 150 had been sexually abused. Well, I think it's — And do we have to go through each one of those and say it was clear error to infer from those much more substantial numbers? I think one problem with that testimony, Your Honor, is it's unclear in the record. Those witnesses did say — and lots of witnesses have said — a lot of kids in foster care have been sexually abused. What's not clear is whether they are saying they were actually abused during their time in the PMC or whether they were abused before they even arrived in foster care. Because as we know, by definition, virtually all of these children have been either abused or neglected severely in order to have arrived in foster care in the first place. I thought the district court also made a finding that, was it 49 percent when they're 8, 19, have just aged out, the women are pregnant? That wouldn't have preceded going into the system. Isn't that a fact the district court found? The district court did make some findings in that respect, Your Honor. But I think we have to look at the objective data here. We can't — and again, when we're taking — extrapolating from a small sample — This is just a lot of data the district court credited. So I think my reading of Ball, the litigation, Ruiz, even Connor B., is for us to overturn it. In Connor B., the First Circuit said, we affirm the district court's factual finding. And what did that factual finding include? The First Circuit said, we agree the study shows 98 percent not hurt. But here we have testimony credited by the district court that says 49, 50, almost all. And here's the problem with that, Your Honor. What Connor B. looked at in that case were the CFSRs, the Children and Family Service Reviews from the Children's Bureau. And it looked at how Massachusetts was performing terribly, consistently in the bottom decile of those. They said, but nonetheless, they're still protecting 99 percent of the kids in their care. Here, Texas scored much, much better on the CFSRs. And the district court said, well, never mind that. I don't need to look at the objective data. We've got these 12 hand-picked children here. And so this gets back to the question of the standard of review. It is clearly erroneous for the district court to draw that conclusion when the objective data is showing something else. And even, for example, the district court noted that children in PMC averaged 4.5 placement moves during their time, or 4.5 placements. And just looking at the name plaintiffs as recited as their histories are recited by the district court, they all had many times that number. There were some with 25, 52, or more placements. It's obvious on the face that those are not typical. Right. But common to all the kids, 12,000, would be deficiencies in the computer system that don't register, you know, or caseworker load. That wouldn't be specific to 12. Those were forms that the district court's focusing on. Starting with the computer system, Your Honor, not a single witness at trial testified that children were at risk of harm from the computer system. The district court's, well, the court may have said obvious, but isn't it obvious that if the computer system doesn't indicate  that a child that has previously been a sex offender, there doesn't need to be much data to support that concern. So if the computer doesn't indicate that to workers. Well, this is the problem, though, Your Honor. The district court drew the conclusion about the computer system based on the case files of the name plaintiffs, which are incredibly atypical and unrepresentative. As the district court noted very well. But you have disclaimed in your reply brief, you are not making a Rule 23 argument. I mean, it's an explicit disclaimer. Defendants did not argue that. But we may, we may yet make a Rule 23. Right. But for purposes of the stay. For purposes of the stay motion, correct. We are not. But that's, again, Connor B. and Lewis v. Casey, both of those were class actions. There was no certification challenge. The challenge was on appeal, there was failure to show system-wide injury, and therefore system-wide injunctive relief was inappropriate. That's the argument we're making here. And it's not enough to say, based on this anecdotal evidence, when the, that everybody in the system had a substantial risk of serious harm when the objective data shows otherwise. I just want to take some examples from that, the CFSR data that these courts rely upon. The Connor B. Court relied upon it. The Cassie M. Court relied on this data. It showed in the 2014 report, that was the evidence in front of the district court when it made its ruling, that Texas exceeded the ambitious national standard of six of the seven statewide data indicators. And Dr. Zeller, plaintiff's expert, took their score of 7.8 incidents of abuse and neglect for every 100,000 days in foster care, and translated that into a statistic that a foster child in Texas has a 0.59% chance per year of being abused or neglected, which he complained made Texas foster children only 58% safer than children in the general population. There was no witness who could testify that that is a substantial risk of serious harm. That's why they had to change the standard from substantial risk of serious harm. But the district court embraces Hernandez and does say, in other words, what I have found is the substantial risk of serious harm. Well, what the district court actually said was, in other words, unreasonable risk of harm, which is not the standard. Well, the district court, when it quotes Hernandez, specifically says, as I read it, the two are interchangeable. To put it otherwise. Put it another way, I think, is how the district court framed it. And what we're saying is, if the district court had simply been following the standards laid out by this court in Hernandez, it wouldn't have had to say, put another way. Because what the court's doing there really is conflating the right to personal security and reasonably safe living conditions, as the court articulated in Hernandez. But then you've got the liability standard required under the 14th Amendment. Deliberate indifference to a substantial risk of serious harm. And that's what the court doesn't really grapple with, with this unreasonable risk of harm standard. And the problem with that, has any court clearly said it has to be the same standard for death row inmates as it is for children that haven't been convicted of anything, were taken out of a family, and end up in a family where they get abused? Has any circuit court yet said it is that high standard, deliberate indifference, to shock the conscience conduct, as opposed to Youngberg? Do you know of a circuit that has done that? I don't, Your Honor. I think, I mean, this court has indicated that deliberate indifference is the appropriate standard in foster care cases. The First Circuit, I think, has suggested the other way. All the courts that have looked at it, to my knowledge, have basically said it doesn't matter because all of these are trying to arrive at the same shock the conscience. And this district court said, at least it said it was applying the shock the conscience standard. Right. And it applied both standards, sort of as a backup. It applied deliberate indifference, and then also the professional judgment standards from Youngberg v. Romeo, and said, as other courts have concluded, it really doesn't matter. I haven't seen one court yet that has applied both standards and says it makes a difference which one you apply, because at the end of the day, it's got to be only the most egregious official conduct is arbitrary in the constitutional sense. And what plaintiffs are complaining about here really are their policy complaints. They're saying, we would prefer that you do this policy. This policy is the best practice, and we think this would be better. That's not what the Constitution requires, and that is not conscience shocking. That is not arbitrary. I don't think they're saying, we think the Constitution requires a cap or a ratio or a computer. They're saying the Constitution requires no substantial risk of serious harm. And those are the district court found, those elements, without those elements, we have that risk. And how can they say there's a substantial risk of serious harm when there are three main — Zeller was struck. He was the only one of the plaintiffs' experts who even tried to put a number on it. But you did make these arguments. These are evidentiary arguments. This is sufficiency of proof. And the district court was the fact finder. And we — obviously, we have to go through it all. But if this is the substantially likely-to-succeed argument — I understand. You understand. But now, on that point, you briefed it as your first-prong obligation was substantially likely to succeed. But I think I'm right in the stay motion you filed in the district court. You cited a slightly softer standard, which is a substantial case which, on the assumption that the — do you follow me? On the assumption that the balance of equities would weigh in favor of Texas, you might not have to get to substantially likely-to-succeed. I may be speaking confusedly, but can you make sense of that? What standard on the first-prong does Texas urge that we have to find to grant you a stay? We just have to make a substantial showing that we're likely to succeed. We don't actually have to prove that we're going to succeed. It's a substantial showing. Okay. But it is likely a success? That's your understanding? Yes. All right. Again, it's not — it's not more likely than not. It is — we have made a substantial showing. Interest that we're likely to succeed. We will have to decide what the standard is. And one of the things that Judge Iggeson may be referring to is that we have some cases, including a recent case out of Mississippi, where we say we have recognized that a movement — movement need only present a substantial case on the merits when — whether to get a stay of an injunction on appeal. And movement need only present a substantial case on the merits when a serious legal question is involved, and that party can also show that the balance of equities weigh heavily in their favor. I don't know if that's softer or not, but it doesn't require likelihood of success. I think we have a tough legal set of issues here. But what I would want to hear from you is, can you inform us how the balance of equities would weigh strongly in your favor? I think they can, Your Honor. We're talking about a takeover of the Texas foster care system based on findings that, for example, Dr. Carter's testimony — he was the linchpin to the district court's typicality and extrapolation. He knew nothing about the PMC. He thought there were 300 children in the 12,000-child PMC. The district court invited Dr. Miller, but she couldn't testify about where the constitutional level for harmful caseloads was. The district court said, forget about the 25. Just tell me what you think is appropriate. And in terms of the balance of the equities, the plaintiffs are claiming now they're going to be irreparably harmed if the state is allowed to challenge these The district court has been sitting on this case since 2014. Plaintiffs never once moved for preliminary relief of any kind in this lawsuit. The district court — after finding these constitutional violations in 2015, the district court didn't enter any significant injunctive relief. The only injunctive relief it ordered was the 24-hour supervision in the foster group homes. And so we contend that the notion that the plaintiffs are about to be imminently harmed is belied by their own actions and the district court's actions in this case. You're not exempt yet. On the balance of equities, this sort of backs into the earlier discussion we were having with you at the podium. It is hard to assess balance of equities when very little briefing has been given to us about the impact of the 2017 legislation. And so to make it a difficult — I think that leads to difficult questions to both sides. But to you, it would be, you say these are unfunded mandates. But in the district court, you told the district court the legislation was close to a billion more dollars. How would we be able to say this was an unfunded mandate, any of these granular things that it's ordered — hiring more caseworkers — if your representation is that the system now has had almost a billion dollars put into it? Well, the legislature, to be clear, was very generous in this last session and higher pay for caseworkers and more caseworkers' positions, which we both agree that's a good thing. Yeah. What the legislature didn't fund was the tens of millions of dollars that a new computer system is going to cost that's not needed. When, if you look at page 1111 of the appendix — This document you gave in your objections to the self-improvement plan, the second item is you're going to do a computer system. It's not the computer system that the district court wants, and that's a big difference, Your Honor. In other words, this is the classic problem of we know there are some issues with our system. We don't think they rise to the level of constitutional violations, but we're working on them in good faith. But it's a very different thing for a district court to come in and say, I'm going to take over the foster care system and have monitors running things. That's — it's just a — Impact to you is difficult. I know it's quick briefing, but we did expand the word count. I mean, it's three pages on irreparable harm to Texas. It doesn't really tell us, out of 100 points of injunctive relief, which one causes the irreparable harm and how. I understand the concern, Your Honor. All I can — I would very quickly say this. I think it's undisputed that the compliance costs for this injunction are going to be massive, certainly in — Even if you're right in your representation that you're already down to 18, a case load of 18? Yes, 18 and a half. And the reason for that is this, Your Honor. It's a — there's a big difference between having an average case load of 18 and a hard cap at 17, particularly when the district — another problem with that is that the district court has ordered us to eliminate these other secondary workers, like the ICU workers and the placement workers, that are vital to the way we think makes sense to work in Texas. Texas is a very — it's a very sprawling state, and it makes a lot of sense if children are removed from their home community and have to go to specialized treatment somewhere across the state. It makes perfect sense to have — He's being generous to me. So I'm going to — two last questions. One factual, one legal, on the balance of equities. Factually, what relevance does the earlier stay denial as to the 24-hour supervision have to our assessment just of balance of equities? If we said there that we wouldn't stay the 24-hour supervision, balance of equities doesn't require it. Is that at all a significant prior ruling? I don't think it's significant at all, Judge Higginson, for the reason that the court interpreted that injunction. We were arguing that for a much broader interpretation because it was an all-unsafe placements injunction. And the court said, no, no, we're going to read that very narrowly. We're going to read that just as requiring the 24-hour supervision. And so that was the only issue before the court. We complied with that. We did comply. We fully complied with that injunction. The last question is just a purely legal one. In their opposition, you will have seen they cited Texas versus United States in a stark statement that at the stay moment, federalism concerns are not relevant in the balance of equities. Those would be relevant to the merits panel. Do you remember that quote? And do you have a thought about it? I do remember the quote. And what I would say is, to me, it blinks reality to say that in the posture of a stay, to force the state of Texas to be compelled to follow through on all of these injunctive provisions. Right. But how can it blink reality if that's binding law on us? Your Honor, I would say it just goes to the irreparable harm that we're facing. If we have to do all of these things. Okay. Thank you. Thank you. I expect you may get extra time, too, being not concerned. Thank you, Your Honor. May it please the Court. After seven years of litigation that proved the Texas foster care system to be broken and in crisis, the State presents a motion to this Court that essentially asks, what's the rush? Three reasons, respectfully, we submit why this Court That was going to be my first question to you. What is the rush? Here's the answer. Three reasons. I have three. I have three answers to that, Judge Higginson. Why this Court should not stay the reforms in the final order pending the decision on the merit. First, the status quo of this system is dangerous to children who are abused and dying in state care. Second. I'm going to interrupt you on that because you're good enough to remember all three. Status quo is dangerous, but when I look at your opposition, where I get to the really Dickinsonian injuries, you're pulling in post-trial statements where Abbott and Whitman are saying, please give us more money. And then Texas does give a lot more money, which makes me wonder, how can they be delivered indifferent if they're giving close to a billion dollars to the problem? Maybe thanks to your litigation. But here's, I'll frame it as a legal question on that first point. How could we, what authority do you have that we can use post-trial statements to confirm that there is a screaming injury in the next month and a half? Several things, Your Honor. First, in the Yates case, which is a class certification case that was decided just last year, this same issue came up about the state, it was again the state of Texas, saying, we have made changes that eliminate class-wide harm, and in that case, this court said, and it was a heat mitigation prison reform case, this court said, it is not enough to make sure that the policies that apply to all plaintiffs are the same. So in this situation, Judge Higginson, the policies that the state has applied are all the same. The fact that the state is now trying to make some post-order, some post-injunction or post-remedy order. I know that, but do you rely on statements they made to prove the constitutional injury, or do we have to cross out all those statements? What's the case that says that we could rely on that to affirm the liability finding two years ago? Judge Higginson, we have that. I believe we cited that case in our briefing, and I don't have that case. Go to points two and three. There is cases that say post-order statements by the defendant. Now, here, why those statements are relevant, Judge Higginson, in particular, is the state now knows exactly what is concerning the district court, and the state, unlike what the state is saying in court, which is there's no constitutional deprivation, the children are fine, our system is good, outside to the legislature, for example, defendant and current Commissioner Whitman is saying the system is in crisis. This was in October 2016. This is a problem that's been going on for three decades. We do have those quotes. Your time is ticking. Go to second and third. Second, the reforms are not irreparable to the state in this case. Hiring case workers today, for example, just like hiring prison guards in Ruiz, hiring is done in 12 months if we don't believe they will, but if the state were to prevail that those case workers are not constitutionally required, and they can be let go, or they can leave through attrition or normal retirements. In the meantime, however, those extra case workers will allow this system to keep the children safe. As Governor Abbott said a year ago, January 2017, we need more workers to, quote, we need more workers to safeguard our children. We respectfully would submit that steps taken to ensure child safety are never wasted. And thirdly, the clock is ticking on these children. So while a delay, a six-month delay or a year delay, to us as adults may not seem very long, to a child, 12 months at risk can result in a lifetime of pain. Every day, Texas labels new children, new boys and girls, as permanent foster children. And every day, foster teens approach the prospect, the daunting prospect of aging out. But the final order sets out our common sense reforms that can mean that there would be one less former foster student, foster youth on the streets, one less recruited into sex and to go into state custody. When you balance the equities here, of the state who has told the district judge we have a billion more dollars. Relief by relief by relief. We did that in Ruiz. Yes. So just to give you some of the hardest ones, how possibly could the 14th Amendment require a state to pay for driver's ed? How does that in any way fit to the constitutional injury? And I'm not saying that sarcastically. I just think it's the hardest one for you, but then we'd have to work backwards to do our job. I hear you. I hear you, Judge Higginson. I think you framed this very well in questions earlier today. The district court did not find that the lack of driver's ed was a constitutional deprivation. The district court found a system that was broken, that deprived, that put every child, every permanent foster child in this system at a substantial risk of serious harm. To remedy that, the district court went through a very careful and deliberate process calling on outside expertise in order to find the best remedies. One of the aspects that the trial focused on were how these children depart from the state's custody when they age out at age 18. And what the evidence, and Ms. Carpenter, as you, Judge Higginson, pointed out, she deals with these children that age out. And what the evidence is, is these children come out of this system far worse than they go into the system. And one aspect of that is they are completely unprepared for adult life. Now, is there a constitutional right to a driver's license? We're not suggesting that. But will it allow, is it a remedy for the injuries, for the constitutional injuries that this district court has found, that these children get something as simple as training on how to be adults? It looks really commendable. But again, if we have to, it's like the law that we've got is the prison reform law. And so, as you know, I was on the recent Ball decision. It is granular. So you're right, maybe higher, but don't build a prison. So I guess shifting to the first prong, what they've pointed out is, if we look at the Supreme Court Lewis decision, we look at the First Circuit Connor B. decision, the Seventh in that K.H. versus Morgan, we've got a lot of circuit in Supreme Court law saying you can't interfere at a micromanaging level. And then I don't think that we've found a single circuit in the foster care system where you do have this sort of attenuated foster families, geography, demographic issue. The one we've got is the First Circuit that says no. So where is the likelihood of success that the Fifth Circuit is going to say this level of overhaul, which was our word, is justified through substantive due process reform? Let me contrast this to Connor B. in the First Circuit. And this court well knows that the merits panel in this case is going to be judging this not to substitute their fact-finding decision-making for the district court, but on clear error. And in Connor B., what the First Circuit did was not to substitute its findings for the district court, but to find whether it was clearly erroneous. And in that case, the district court in Massachusetts said it found a state operating in good faith with an improving system that almost never hurt, that has very, very low harm to the class, to the children, the foster children. In this case, in contrast, the district court found that the State of Texas for decades has known that it has problems with hugely overburdened caseworkers. And in fact, what the district court found in this case is the caseload numbers that the State is using are manipulated. Because, for example, the case and this is getting to your point. So you embrace Connor B. legally. You embrace it, but you say no. Connor B. is, there's nothing about Connor B. The Connor B. dealt with a system that that district judge found was safe, was acting in good faith, and was improving. We and the parents panel in this circuit is going to be dealing with a system that the district court found exactly the opposite, that there was conscious indifference, that there was a decision at some point not to learn more about the abuse and harm that was going on in the system. One example. This system, unique to the country, doesn't track child-on-child abuse. Can we imagine, and I apologize to the prison reform litigation, can we imagine a state trying to justify that they keep no track of inmate-on-inmate assault? And yet, in this case, this state, who proudly presents its statistics as showing that they're in such good standing nationally, when those statistics don't even include child-on-child abuse. In addition, the investigations that, and this came out, this was shocking to the district judge. The investigations, obviously when a report of abuse comes in, the state is obligated to investigate it. What the district court found in this case is they took a small sample. They found, they took two samples. They did an internal audit, and the error rate on the investigations of abuse, these are children being harmed by caretakers, was 65% in one internal audit, 75% in the other audit. What's worse is when the state found this out, the state chose to do nothing about it. Those two findings, 75% and 65% error rates in that sample, went to the commissioner of the department. But the commissioner and the department never told the advisory council, the governing council for the, for DFPS, never told the public, never told the federal government, and didn't tell the children of their casework. That gets you towards the subjective prong, deliberate indifference. That's subjective, yes, it's absolutely. Maybe speak to their central thrust, which is that it was clear error to extrapolate from 12 named plaintiffs to 12,000. And that's, you read Justice Scalia's remarks and Lewis, and there is a strong argument that that is problematic. There would certainly be a strong argument in a case if, in a child welfare setting, a plaintiff class tried to prove class-wide harm with simply anecdotal evidence. This is far from this case. We had, I believe we had 36 witnesses at trial, Judge Higginson. Fifteen of them were from the department, from the defendant, the DFPS. The top 15 from the commissioner, from the commissioner of the department all the way down, top 15 testified in this case. Study after study that the state commissioned itself was in this case. Decades earlier, talking about problems, the same problems that the district court was looking at in 2014 when we had the trial. Expert witnesses came out. Fact witnesses, eyewitnesses to the system. Dr. Carter, for example, we've heard the state call these plaintiffs as cherry-picked. Dr. Carter, a respected psychologist who deals with children generally and foster children generally, his testimony is thousands of foster children, he examined these named plaintiffs and he said there were, and this is in the record, he said they were typical of the children in foster care that he deals with. So it wasn't just a small group of hand-picked plaintiffs. It was systemic. Because what was most damaging to the plaintiff, to the state in this case, were their own internal studies of what's wrong with the system. And Judge Higginson, to get back to your prior point, that is why today, after the trial, that is why the executives of the state, the governor, the current commissioner of the DFPS, that is why they're now saying that this system is in crisis. According to current Commissioner Whitman, he said, we are outnumbered by abuse and neglect. And so- But again, when you keep jumping to statements made post-trial and then you even use the legislation from last spring to say how could they be irreparably harmed, it makes me wonder sort of oppositely to you, what's the current status of the system, vis-a-vis the orders that were based on data two years old now? Because in your opposition, you say, well, they actually accomplished a great deal, so how can they be saying irreparable harm? One thing they have now, Judge Higginson, is lots more money. Now, the problem is, lots more money is not gonna fix the issues that the district judge found. They're policy issues. There are policies that are not being practiced, as the district court found again and again, which of course, how can the state complain of irreparable harm if the district court simply tells the state to follow its own policies? There are policies not being practiced. There are fundamental structural problems. The placement array, where these facilities are for these children around the state, is a top-down decision. It's a policy decision by the executives running the child welfare system that- Also, one of the problems with that, it seems to me, very much goes into something that was said in Connor B. This sort of intervention, I wouldn't say intrusion or whatever opposing counsel said, into a state's foster care system. It's entering to a system with a huge number of very practical problems, and that's one that you just finished talking about. Can you get actual foster parents in enough locations, fairly close to where they're needed? And there's an array of very serious practical problems. The best efforts will not achieve the proper results. So what do you say to that reaction? It's one thing to say that it's beneficial to the kids, unless that's where the abuse was, to be close to their families and to be placed. But that is an enormous difficulty that takes the citizens of Texas, not the voters and whatever, but people willing to be foster parents. And they can't do a lot about that other than make it as attractive as possible. Two things, Judge Southwick. One, this is not an issue simply of having more foster parents. Every state, state of Texas included, has ready options to attract more foster parents through better recruiting, better incentives. But the problem here is not just more foster family homes. Those are the smallest facilities. The problem is also in the larger facilities, the group facilities where children with more specialized needs have special care. And those facilities, it's not a matter of recruiting parents, a foster parent here and there. It's a matter of where do you put these facilities? And what the state has done by largely privatizing, and it is even privatizing, at least it's announced to privatize even more, by largely privatizing the system. And then leaving it up to the private providers to pick where they want to locate has created a system where instead of going to locate geographically in some sort of a balanced way so children are somewhere close to their home communities, these facilities, especially the ones for the children with most needs, are clustered around the big cities, Houston in particular. And so, Judge Southwick, first, it's not just foster family parents, and there's lots of ways of getting more of those. So the, and I had a second point, Judge Southwick, and then I lost it, sorry. Hopefully that was good enough. I don't know, Harry, if you had three points, but your first point's fine. Okay, thank you. I will say one level of argument where you're saying it's not just this, it's not just that, it's a variety of policies that could eventually lead to Rule 23 problems, which existed severely in this case before. So do you have a, I know that's not being pressed by Texas now. Do you have a, what would be the best Rule 23 class case you'd cite if the issue were before? Well, what we did was we followed this court's ruling in MD versus Perry. This court said that you can't have a super class. So what we did is we have a general class that simply focuses on caseloads, and we have two subclasses that are very specific. One is just on foster group homes, and one is on licensed foster care, which is on the placement array and monitoring and licensing. So what we did, we believe, we used this court's decision, earlier decision, as a roadmap. If I could go back to one, or I could touch on one thing before we finish. I think that what the state's biggest problem here is they have not spent any time in this court trying to prove irreparable harm. They simply come in and wave their hands and say, there's lots of change here, so it must be very expensive. Well, what the state hasn't done is quantify in any way whether this expense is going to be anything different than what they've already been allocated by the state. The district court, in her final order, said that the state has represented they have a billion dollars more. None of the reforms that are in the final order has the state ever proven or even tried to prove to the district court could not be accommodated by the billion dollars extra that the legislature gave them. It may just be the professionalism of you two, but it is a case that throughout, having looked at it, it seems like there could be a huge amount of common ground. They fought hard, Texas fought hard to get a lot of money. They did just get it. All that antedates the order that, in large part, we're being obligated to go through. So I know there have been other concerns. The court has expressed them sharply about Texas not cooperating. But it's still, it's not a case that I see as politically divisive. It's a case where there could be a great deal of narrowing. I think there's lots of common ground. I think there was a mention earlier of federalism. I think there are very strong overtones of that, and I think the children are being victim, are pawns in the middle of that. Because what I think that reform will do, these practical common sense reforms, is not just make a better system that will protect the children today, but it will save the state money. As the court may have seen, and this is in the appendix, this is in the record before you, children that are aging out of foster care cost the state tremendous amount of money because, according to Commissioner Whitman, 27% of the children aging out of this system. But if the 14th Amendment requires sort of an overhaul, microscopically, even for the district court, say no more ICU workers. And I know there's logic to that, but it is saying no more of these people, which seems a little counterintuitive.  You have 400 clients you're representing, that's a 14th Amendment violation. If we say caps qualify, there are lots of areas of law where people would be running into federal court. A couple of things, Judge Higginson. This is an area where the state has taken upon itself a special relationship. Because it has taken into custody innocent children. These are not inmates. These are not even pretrial detainees. These are not persons with mental illnesses that have been confined, institutionalized. These are innocent children. They've taken them into their custody. There's no court that we have seen at the circuit court level that has said the same standard of simply personal security and reasonably safe living conditions applies to children. The courts have kind of danced around it. They've been able to make their decisions. Our case is almost, it is entirely based on essentially personal security and reasonably safe living conditions. Because all of these issues relate to the well-being and safety of these children. So, so, so, we believe, so, so I hope that answers your question, Judge Higginson. A, something of a question, we'll see if it ends up that way. It seems to me that the reluctance courts have had to enter into this very significant area of, of state responsibility. Is there are so many obligations of the state and so many difficulties for the state to deal with these children. Some of it's financial, a lot of it's otherwise. The particular focus for me at least, and some opening comments to the two of you, and to both sides, not just the two of you individually. If there is a way for less of this to require federal court intervention and more of it to be done by an understanding of what they have, have done and are trying to achieve without the mandate of a federal court. I think that is best all around, but we will see how that plays out. Judge Southwook, if I could make one last comment without overextending my time. The court is certainly familiar with Brown versus Plata that came out just a few years ago by the U.S. Supreme Court on California prison reform, and it was overcrowding, and there was a dramatic decision that came out of California to, to cap the prison population. And what the Supreme Court did in affirming that, that injunction, capping, it was a very significant thing, capping it. What the Supreme Court did was say, emphasize more than once, that there's nothing that stops the state from trying other ways of accomplishing the same result, which was to deal with the ills of overcrowding. And there's nothing then with changed circumstances that would stop the state from going to the district judge and saying the cap is no longer warranted. The cap on prison populations, and the same is true here. If the state, the district court, we believe very commendably, invited the state of Texas over and over again to participate in the remedy phase. Help us craft the best remedies so we don't end up either becoming too blunt or too granulated, and that still exists. And if the state were to come in now and, and help and, and propose something better. For example, they have their own idea of a computer system. If the state were to go to the district judge and say, this is a better way of doing it. It's more efficient for us. It works better. It may even save us some money. It has every right to do that. And the district court, the district court has, the history has, is the district court would consider it carefully. On that point. Yes. You didn't oppose the stay motion being filed to us. Right, you're familiar, the rule, rule eight language. And had, had the exact language of the rule been applied or perhaps if we do apply it as it reads. In fact, what you've just said about the state district court's flexibility would exist. If it decided the pending stay motion before it. They could come in and say, hey, a lot of this we've already done. It's just we haven't been communicating very well. But we can really narrow this down. Why, the question therefore is, did you think at all about the language of rule eight when simultaneous motions were filed? It happened relatively quickly. I think they were both filed on the same day and the court granted the administrative, this court granted the administrative stay the same day. Okay. I will say on that, we actually think, and this question came up earlier, that the stay decision by this court earlier, Judge Southwick, you were on the panel. We actually think it's a very significant decision because one of the key things that the state is bringing up this go round is the same thing it brought up last go round, which is foster group homes. This go round, they're saying, moving children out of foster group homes, these certain foster group homes, that they've had two years notice were going to be closed, is going to be disruptive for the children, and for that reason, we shouldn't have to do it. Well, the last time they tried to stay that injunction that the district court ordered, this court turned it down and said, you're not going to, fundamentally, on the, you're not making a strong showing of likelihood on success of the merits. So that was a stay of obligation to have 24-hour monitoring, awake, whatever it's called, monitoring, which is a narrower issue, certainly, than what we're talking about here, and regardless, we'll have to discuss how much impact that ruling will have on what we're doing today. I guess my only point, Judge Southwick, was in their briefing on this stay, they bring the same issue up again, foster group homes with 24-hour care, and they're now saying, oh, we fixed all the problems, even though the district judge has found that they haven't fixed the problems, that these are still dangerous, and that they should be closed, and parenthetically, I would add, as Judge Higginson, you may have seen as well, the state legislature, as of September 1st of last year, has told the department, no more foster group homes. So we would respectfully submit that it can't possibly argue irreparable harm in wanting to keep children in a placement that the district court has found to be dangerous, and that the legislature has told the department, you may not license any more of these homes, and that clearly are being phased out. Thank you, counsel. Thank you. That is it. One thing of a very minor matter I want to be sure about before you leave, how do you pronounce your name? Hughes, Your Honor. Ah, I do have it backwards. Okay. Mr. Hughes. A couple points on this. I think Judge Higginson, I believe you were asking about the out-of-court statements, and I would cite the court to language in its second Deepwater Horizon opinion, where the court said, quote, under the settled law of this circuit, an appellate court may not consider facts which were not before the district court at the time of the challenged ruling. That's from 739F3 at 805, and that applies not only to these various out-of-court statements that plaintiffs are relying on, but also all of these post-trial studies that were supposed to be in furtherance of coming up with a remedial plan, that in retrospect now, the plaintiffs are trying to use to bolster belatedly the district court's liability rulings, which were? Special master work. Yes. Not the expert work in the studies given at trial. Well, to be clear, there are two groups of experts here. I'm not talking about the expert witnesses at trial. There were experts also retained by the special masters to do studies, and those studies were done not only well after the trial, but after the court had made its liability rulings, which the district court never revisited. And so it's improper procedurally for the court to consider any of that, even though the plaintiffs are urging that as evidence to try to bolster those rulings. That's helpful. Well, are you going to save a little time for FRAP 8, or do you want to turn with that right now? I can if you like, Your Honor. If it says, file in district court ordinarily, file to us if impracticable to move in district court, on the one hand, since you did file in district court, that's hard to say it's impracticable to file in district court. Well, the situation we were facing, Your Honor, the district court issued that opinion on a Friday afternoon. I know. All of these immediate things, including removing the children, so we made a determination. We had to do it, seek this court's relief. We also did move the district court. The district court has not acted on that motion. If this court would like to maintain the stay and allow the district court to rule on that, we would certainly welcome that. Wouldn't there be practical reasons for that, given the volume, the record volume? But especially in my mind, given the fact that both sides so heavily are urging that the context has changed. I mean, a minute ago, opposing counsel said group homes are being phased out, and therefore, that coincides with the — and you're saying they're down to 18, which I'm sure they dispute, but that's significant. I think, Texas Represented, you are visiting privately with each child each month. So huge portions of the court's concern, based on the trial two years ago, both sides are suggesting that's all different now. Why wouldn't Rule 8 saying she should assess balance of equities, especially in the first instance, make a lot of sense? Well, I'm not sure that there's anything that would preclude the district court from ruling at this point. No, and there is nothing. But I read the language to suggest disfavoring, and I'll add one legal site, but you probably know it, therefore. Ruiz, isn't it true that the district court had a hearing on a stay and issued a stay order before we did the very intricate stay work that we did? Do you remember that? I vaguely recall it, Your Honor. Yeah. What is unclear to me, though, is what we're supposed to do. In other words, if you want to send a message to the district court, please address the stay motion. We'd be happy to have the stay continued until the district court does that. We strongly suspect the district court is going to deny the stay motion. We've had every indication of that from everything throughout this litigation. We don't think it's going to change. And to be clear, the argument that we're making is not there were constitutional problems before, but what the legislature has done has solved those constitutional problems. Our argument is the plaintiffs never proved the very demanding burden of showing substantive due process violations class-wide. The remedies that the legislature has provided since then, they do change, they go to the lack of injury to the plaintiffs, because the status quo has actually improved markedly. But to be clear, we're not saying we were unconstitutional then, but we're good now. That's never been our argument. One of the things that perhaps Judge Higginson and I, or both folks in the audience, certainly I am, is whether it goes back to the district court or whether you can do it through mediation or whether some other mechanism. What this court needs in order to make a legitimate resolution, I don't mean this panel, but what the Fifth Circuit ultimately will need to make a legitimate resolution is to know what is the situation. Is this, in fact, we have to deal with your arguments that there's no system-wide constitutional violation. But if we were to get beyond that, the merits panel primarily talking about that, is there, in fact, still a legitimate basis for this kind of resolution by the district court? And it seems to me what has not, you know, maybe a romance situation that's out of my hands to get a better handle on where we are right now with what Texas is doing. But I hope that the mediation will allow us to get a better understanding of what Texas, the plaintiffs can agree that Texas has already done. I'm not trying to put too much pressure on either one of you, or the panel isn't, but I don't think we have a clear picture of where this case is, factually. Your Honor, to be clear, I'm not sure if you're talking about doing a mediation while there is some kind of stay in effect, or, because that's the problem. We're under these tremendous pressures, not only if, obviously, if the court's injunction goes into effect, we've got to be doing all these things right now, and both short-term and long-term. And then, of course, we need to be briefing on an expedited basis the merits of this court. The state of Texas has waited, I would say, very patiently for the last several years for an opportunity to rule, to get a ruling on the district court's liability rulings. And we finally have gotten that. The record is full of statements that Texas is not developing a plan in so many responses. The record is very open to recalcitrance, non-cooperativeness, and that the certification issue went back down. Texas might have appealed, but missed it by a day. So it's hard to just say this is Texas waiting patiently. Judge Higgins, if I may just address that recalcitrance point alone. We briefed this in our reply, that both plaintiffs and the district court made this point of we were being recalcitrant because we simply provided information to the special masters. And according to the district court, we, the 2015 order to develop and implement policies and procedures, that we have been supposedly disobeying that since 2015. That is completely belied by what everybody understood, including what the district court said, that it was the special master's job to be developing these remedies with our help, which we gave them. Hundreds of thousands of pages of documents, lots of consultations, and we were praised lavishly for our cooperation with the special masters. You can cite that in the reply brief, yeah. And then, the final order comes out in 2018, and we find out, according to the district court, that we were supposed to be independently working on these policies and procedures, that we were paying the special masters a million and a half dollars to develop. And the district court had said to the special masters, this is your job to be doing this, and that's what this court understood in its order as well. Judge Southwick, I think you may have been on that panel, denying the stay, where the court said, yeah, it's the special masters. They're going to come in, they're going to tell the, recommend provisions of the district court, the district court will adopt them, and then the state will implement those procedures. And now the district court is trying to say, we have been recalcitrant because, in the words of the plaintiffs, we're failing to obey anticipated remedies. Basically saying, because we had the temerity to insist on our right to appeal from these constitutional rulings from the district court. And we believe that we have that right, and we intend to seek it, and if there's other ways to go about this, including staying in the proceedings to allow further mediation, we're all for that. But we are insisting on having our day in court and having these constitutional rulings reviewed. Counsel, there's a lot on both of your plates, both sides, not just talking about the two of you individually. One of the things we mentioned early on today was the mediation. Before you leave, Vic, would you stand up? I wish you would introduce yourselves to that man. He is our mediator, and he is just getting an early understanding himself of what we might be interested in. All we're trying to do is to see if there's a way he can help you inform us of where we are in this case. And you've got 10 less days to write your brief, I understand that, and they have less time as well, and so all these moving pieces. But that's why you get paid more than we do, I guess. So nonetheless, we have no further questions for you today. Thanks, all of you, for being here and help us understand this. You may all be back in a few months, I'm not sure, but you'll have to see what panel that is at that time.  Thank you, Your Honor.